ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE

————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

No. 22-3061

————————————

UNITED STATES OF AMERICA,                    Appellee,

v.

SHANE BROWNE,                              Appellant.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
* KEVIN BIRNEY, D.C. Bar # 1029424
Assistant United States Attorneys

* Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Kevin.Birney@usdoj.gov
Cr. No. 17-241 (TNM)          (202) 252-6829

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

## Parties and Amici

The parties to this appeal are appellant, Shane Browne, and appellee, the United States of America.

## Rulings Under Review

This is an appeal from an order by the Honorable Trevor N. McFadden denying appellant Browne's motion alleging ineffective assistance of counsel. Appellant seeks a reversal of his kidnapping conviction and a remand for new trial.

## Related Cases

This Court affirmed Browne's convictions on direct appeal and remanded to the district court for consideration of his ineffective-assistance claims. *See United States v. Browne,* 953 F.3d 794 (D.C. Cir. 2020).

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are contained in the Addendum to the Brief for Appellant.

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE CASE ........................................... 1

   The Kidnapping and Marijuana Evidence ........................................ 3

   Flores's Immigration Status .................................................... 7

   The Ineffective-Assistance-of-Counsel Proceedings ......................... 8

      The Declarations ........................................................ 8

         1.  Sands and Keslow ........................................ 9

         2.  Kalafat ...................................................... 10

         3.  Farrelly .................................................... 14

      The Evidentiary Hearing ............................................. 18

         1.  Keslow ...................................................... 18

         2.  Kalafat ...................................................... 18

         3.  Farrelly .................................................... 22

         4.  Browne .................................................... 24

      The District Court's Order ........................................... 25

SUMMARY OF ARGUMENT ..................................................... 31

ARGUMENT ...................................................................... 34

   Browne Failed to Establish that Trial Counsel Rendered Ineffective Assistance. ......................................................... 34

      A.  Standard of Review and Applicable Legal Principles ........ 35

      B.  Discussion .......................................................... 36

         1.  The Marijuana and the Blind Plea ............................ 36

         2.  Sands and Keslow ........................................ 41

3.   The Adult-Website Searches ........................................ 46

4.   Miscellaneous Objections .............................................. 47

5.   The Jury Instructions ................................................. 49

6.   Defense Theory and Closing ....................................... 52

7.   Prejudice ................................................................... 55

CONCLUSION ............................................................................. 58

# Table of Authorities*

**Cases**

*Harrington v. Richter*, 562 U.S. 86 (2011) .................................. 35, 46, 47

*Knowles v. Mirzayance*, 556 U.S. 111 (2009) ......................................... 35

*Missouri v. Frye*, 566 U.S. 134 (2012) .................................................. 39

*Padilla v. Kentucky*, 559 U.S. 356 (2010) .............................................. 35

*Scott v. United States*, 954 A.2d 1037 (D.C. 2008) ................................. 40

\* *Strickland v. Washington*, 466 U.S. 668 (1984) .................... 27, 35, 46, 57

*United States v. Aguiar*, 894 F.3d 351 (D.C. Cir. 2018) ......................... 39

*United States v. Booker,* 436 F.3d 238 (D.C. Cir. 2006) ........................ 48

*United States v. Browne*, 953 F.3d 794
  (D.C. Cir. 2020) .............................................. 2, 3, 4, 6, 7, 36, 38, 50, 52

*United States v. Doost*, 3 F.4th 432 (D.C. Cir. 2021) ............................. 36

*United States v. Gray-Burris*, 920 F.3d 61 (D.C. Cir. 2019) ................... 51

*United States v. Marshall*, 946 F.3d 591 (D.C. Cir. 2020) ...................... 49

*United States v. Mohammed*, 863 F.3d 885 (D.C. Cir. 2017) ................. 41

*Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017) .................................. 35

---

\* Authorities upon which we chiefly rely are marked with asterisks.

## Other References

18 U.S.C. § 924(c)(1)(A)(ii) ................................................................. 1, 56

18 U.S.C. § 1201(a)(1)................................................................................1

21 U.S.C. § 841(a)(1)..................................................................................1

D.C. Code § 22-402 ....................................................................................2

D.C. Code § 22-2001 ..................................................................................1

D.C. Code § 22-4502 ..................................................................................1

D.C. Code § 22-4504(b) ..............................................................................2

Criminal Jury Instructions for the District of Columbia
  § 2.111 (2022) ......................................................................................49

Criminal Jury Instructions for the District of Columbia
  § 2.219 (2022) ....................................................................... 50, 51, 52

# Issue Presented

Whether Browne established that his trial counsel rendered constitutionally ineffective assistance where, after an evidentiary hearing, the district court found that counsels' decisions regarding various pretrial and in-trial matters were strategically reasonable and worked to Browne's benefit, and where any conceivable missteps would have had no tendency to influence the verdict.

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————————

No. 22-3061

————————————————

UNITED STATES OF AMERICA,                               Appellee,

v.

SHANE BROWNE,                                           Appellant.

————————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————————

BRIEF FOR APPELLEE

————————————————

## COUNTERSTATEMENT OF THE CASE

On February 27, 2018, appellant Shane Browne was charged with
kidnapping ("federal kidnapping")(18 U.S.C. § 1201(a)(1)); using,
possessing, and brandishing a firearm during a crime of violence (18
U.S.C. § 924(c)(1)(A)(ii)); possession with intent to distribute marijuana
("PWID") (21 U.S.C. § 841(a)(1), -841(b)(1)(D)); armed kidnapping (D.C.
Code §§ 22-2001, -4502); assault with a dangerous weapon (D.C. Code

§ 22-402); and two counts of possession of a firearm during a crime of violence (D.C. Code § 22-4504(b)) (Joint Appendix (JA) 8, 1184-85).

On April 18, 2018, after a trial before the Honorable Trevor N. McFadden, a jury found Browne guilty of federal kidnapping and PWID, but not guilty of the remaining charges (JA 12, 1185). Judge McFadden denied Browne's motion for a new trial on September 17, 2018 (*id.* at 18). On September 28, 2018, Judge McFadden sentenced Browne to concurrent terms of imprisonment of 176 months for federal kidnapping and 60 months for PWID (*id.* at 19).

On direct appeal, this Court affirmed Browne's convictions but remanded his ineffective-assistance claims for the district court to address in the first instance. *United States v. Browne*, 953 F.3d 794, 804 (D.C. Cir. 2020).

On remand, the district court held evidentiary hearings on June 7 and 8, 2022 (JA 29). The district court denied Browne's motion in a written order issued on July 22, 2022 (*id.* at 1203). Browne timely appealed (*id.* at 29).

### The Kidnapping and Marijuana Evidence[1]

On December 11, 2017, Lyft driver Ulises Flores transported Browne from Browne's apartment in Washington, D.C., to a motel in Aberdeen, Maryland. *Browne*, 953 F.3d at 797. During the drive from D.C. to Aberdeen, Flores overheard Browne on a phone call discussing email encryption and the plans for another person to take over Browne's "business" should anything happen to him. *Browne*, 953 F.3d at 797. Browne smelled of marijuana. *Id.*

When the Lyft arrived at the motel in Aberdeen, Flores "finish[ed] [the] trip" on the Lyft app because Browne had not programmed a round trip (JA 93). Flores also was concerned after overhearing Browne's conversation (*id.* at 228). Angered, Browne asked why Flores finished the trip (*id.* at 93-94). Flores replied that Browne had not set up a round-trip (*id.* at 93). Browne then directed Flores to a McDonald's parking lot (*id.* at 92, 94).

---

[1] The evidence at trial is described in detail in the government's brief in Browne's direct appeal, see Appellee Br., *United States v. Browne*, No. 18-3073, at 2-16 (D.C. Cir.) (Aug. 1, 2019), and is summarized in this Court's subsequent opinion, *see Browne*, 953 F.3d at 797-99.

After Browne got out of the car at the McDonald's, Flores did not leave immediately because he had made 13 trips that day and needed time to get a coffee and stretch (JA 233, 327-28). Flores called his wife, reporting that he had a strange feeling about Browne (*id.* at 94, 235). He then entered the McDonald's, where he got a coffee and visited the restroom (*id.* at 95). In the McDonald's, Flores saw Browne sitting alone with his hood up, apparently waiting for someone (*id.* at 95-96). Flores went back to his car and cleaned his windows (*id.* at 98-99). He then got back into his car and called his wife (*id.* at 103-05). Flores ended up staying in the parking lot for over 17 minutes. *Browne*, 953 F.3d at 797.[2]

While Flores was on the phone with his wife, he heard someone pop the trunk of his car (JA 105). Upon exiting his car, Flores saw Browne putting a dark suitcase (which he had not had previously) in the trunk (*id.* at 105-08, 127). When Flores confronted Browne, Browne shook Flores's hand and asked for a ride back to D.C. (*id.* at 108-09). Although Flores initially refused, Browne continued to move towards the car (*id.*

---

[2] Flores initially told police that Browne asked him to wait five to ten minutes, but at trial he testified that Browne did not ask him to wait at all. *Browne*, 953 F.3d at 797.

at 109-10, 197-98). Flores ultimately got into the driver's seat because he was concerned about his personal belongings in the car (*id.*). Browne got in the backseat on the passenger side (*id.* at 110). Flores testified that, once back in the car, Browne put a gun to his head and told him to drive him back to his apartment in D.C. (*id.* at 111-17).

Flores drove Browne back to D.C. (JA 117-18). Browne held the gun behind his head for the entire drive back, though he moved it slightly at various times so that it was either touching Flores's head or being pointed at him (*id.* at 119-20, 123). During this time, Flores again heard Browne on the phone, this time telling someone named Jordan that "Ulises" was driving him home (*id.* at 120). At one point, Browne became distracted, and Flores was able to email Lyft and ask them to call the police because he was "in trouble" (*id.* at 121-23).[3] During a stop at a toll booth, Browne tried to hide from the cameras (*id.* at 123-24). When they arrived at Browne's apartment, Browne gave Flores $100, retrieved his suitcase, and walked into his apartment building (*id.* at 125-27). A nervous Flores unsuccessfully tried to video Browne, planning to call the police (*id.*).

---

[3] This email was entered into evidence (JA 201-02).

After Flores drove several blocks, he called Lyft again to request them to delete his personal information from the app (JA 121, 128-30, 282). Flores planned to call the police afterwards (*id.* at 129). While on hold with Lyft, Flores contacted OnStar and described the situation (*id.* at 128-31). Flores initially declined the OnStar operator's offer to call the police because he still wanted to talk to Lyft, but after a few minutes, he agreed and spoke with the police (*id.* at 130-31). *See also Browne*, 953 F.3d at 797-98. He explained the incident and told police he thought Browne was a drug dealer. *Id.* at 798.

Later that evening, police arrested Browne at his apartment. *Browne*, 953 F.3d at 798. The officers noticed a strong smell of marijuana coming from Browne's apartment. *Id.* Browne confirmed that he had been smoking marijuana. *Id.* The police did not immediately search Browne's apartment, which was on the seventh floor, but they searched the sixth-floor balcony below Browne's balcony, as well as a garden area further below, for a gun and ammunition (JA 338-40, 370-373). They did not search any part of the seventh-floor trash room or the trash chute that night (*id.* at 379, 384-85). Officers searched Browne but did not find any gun or ammunition (*id.* at 346, 349).

The next day, officers executed a search warrant at Browne's apartment. *Browne*, 953 F.3d at 798. They found a money counter, a heat sealer, drug paraphernalia, more than $35,000 in cash, and seven suitcases and other containers, some of which were filled with heat-sealed bags containing marijuana. *Id.* In total, police recovered approximately 78 pounds of marijuana in Browne's apartment, but they never found a gun in the apartment or the surrounding areas. *Id.*

## Flores's Immigration Status

Flores, a native of El Salvador, had entered the United States on a visa in 2008, and overstayed it (JA 77-79, 139). As of December 11, 2017, he had not sought legal status in the United States (*id.* at 140). Married and supporting a family, Flores did not want to be deported (*id.* at 286-87). On December 12, 2017, Flores met with agents and a prosecutor and let them search his phone (*id.* at 142-44). A few days later, he testified in the grand jury (*id.* at 144). "[A]fter the holiday season," the prosecutor and agents explained "the deferred action process" and "the U visa

process," although they offered no guarantees (*id.* at 144-45).[4] Flores had voluntarily given agents his passport and "basic documentation," met at an "ICE office" for fingerprinting, and entered the deferred-action program, which protected him from deportation only for the duration of the proceedings in this case (*id.* at 146-50). As a crime victim, Flores was eligible for a U-visa and had a lawyer helping him with his application; he had not completed that application at the time of trial (*id.* at 145-46, 149-51, 289). The U.S. Attorney's Office had sent Flores's lawyer a letter stating that Flores was a victim of crime (*id.* at 151-52). Flores was cross-examined about these issues at trial (*id.* at 286-89, 700, 703-04, 707-09).

### The Ineffective-Assistance-of-Counsel Proceedings

#### *The Declarations*

Following this Court's remand, Browne and the government submitted declarations from multiple individuals regarding the ineffective-assistance-of-counsel issue. As relevant here, Bryant Sands,

---

[4] Flores's wife, a permanent legal resident, had her status adjusted via a "U-visa" as a victim of domestic violence (not perpetrated by Flores) (JA 140-41). Flores thought that U-visas were available only to domestic-violence victims (*id.* at 142).

8

Jordan Keslow, Jason Kalafat, and Sean Farrelly all submitted declarations.

### 1.    Sands and Keslow

Sands, who was Browne's childhood friend, spoke with Browne on the phone during the trip to Aberdeen (JA 779-80). Sands denied that he spoke with Browne about email encryption and what would happen if Browne ever went to jail (*id.* at 780). Sands claimed he would have testified to those facts had he been called at trial (*id.*).

Keslow, also Browne's childhood friend, spoke with Browne over the phone for seven minutes while Browne was at the McDonald's and for 31 minutes on the ride back to D.C. (JA 781-82). He admitted that Browne told him that "Ulises" was driving him back (*id.* at 782). He did not hear any argument between Browne and Flores, or anything else that would indicate that Browne was holding Flores at gunpoint (*id.*). Keslow also denied that he spoke with Flores about software and protecting emails (*id.*). He claimed that he and Browne spoke about bitcoins and cryptocurrency (*id.*). He stated that he would have testified to those facts had he been called at trial (*id.*). In fact, he had attended the trial in the audience (*id.*).

## 2.    Kalafat

Kalafat and Farrelly were Browne's trial counsel (JA 787). Kalafat had represented hundreds of criminal defendants since 2002 and had participated in about 87 criminal trials, about 34 of which were jury trials (*id.* at 786). Kalafat and Farrelly ultimately decided against presenting an affirmative defense theory of the case because Kalafat believed that doing so "restricts the defense's ability to argue reasonable doubt" (*id.* at 788). Instead, "the defense can argue, and individual jurors may be persuaded by, multiple alternative theories to the government's theory of the case" (*id.*). But "[i]f the defendant offers an affirmative defense and theory of the case, . . . the jurors are instead left to choose between two competing narratives" (*id.*). Kalafat did not think that the government had a strong case on the kidnapping charges; no gun was recovered, there was no corroborative evidence, and Flores had a motive to fabricate to get a U-visa (*id.* at 789). Kalafat and Farrelly therefore decided to "attack[] the holes in the government's case and the credibility of [Flores]" (*id.*). They discussed this strategy thoroughly with Browne (*id.*).

Kalafat considered putting Browne on the stand if possible (JA 789). However, Browne refused because he did not want to testify about

his drug enterprise, and Kalafat knew that Browne could not avoid being questioned about the other individuals in his drug enterprise if he testified (*id.*).

Kalafat did not remember speaking with Browne about Sands, and Kalafat never personally spoke with Sands (JA 790). He did not see the relevance of Sands's testimony because there was no question that Browne had spoken to someone on the phone during the trip to Aberdeen, and none of the criminal activity had occurred during that time (*id.*). Kalafat recalled Browne mentioning Keslow, but Kalafat did not recall speaking with Keslow (*id.*). He thought that Farrelly might have done so (*id.*).

Kalafat reviewed the discovery materials from Browne's phone and discussed it with him (JA 791). The phone evidence established that Browne had talked on the phone during the trip to and from Aberdeen (*id.*). Kalafat understood that "[t]he relevance of [Browne] being on the phone was that he would not be likely to carry out an armed kidnapping while also doing things on his phone," but Kalafat did not see the relevance of "getting into the actual contents of the phone" (*id.*). Further, Browne did not want his then-girlfriend to become involved in the case

11

and therefore did not want to introduce phone records involving her (*id.* at 791-92).

Kalafat did not recall speaking with Browne about pleading "blind" to the marijuana count, and he did not recall Browne ever saying he wanted to plead guilty to that count or any others (JA 792). Kalafat warned Browne that the defense would not be able to keep the marijuana evidence out of the trial, even if the only charges were kidnapping charges, given that Browne "took an hour-and-a-half Lyft ride to Aberdeen to go to a McDonald's, and based on the video evidence, the only thing he did there was pick up a suitcase" that resembled other suitcases filled with marijuana that were recovered from his apartment the next day (*id.*). Kalafat noted that "[t]he only motive for the alleged kidnapping would be the transportation of drugs, which would also be the only reason for the defendant to carry a gun" (*id.*). Kalafat did not think that the district court would exclude this motive evidence (*id.* at 792-93). Because the defense could not "keep the drug evidence out," Kalafat saw no "tactical advantage in pleading to the drug charge early and without a plea agreement" (*id.* at 792-93). Kalafat did perceive a strategic advantage in leaving the marijuana count in the trial, however, because

it "gave [the jury] the option to convict [Browne] of something he was clearly guilty of and to therefore acquit him of the other charges for which the government's evidence was not nearly as clear" (*id.* at 793). Kalafat based this strategy on his many conversations with juries over the years, in which they had indicated that they do not want to grant a complete acquittal to someone who is clearly involved in criminal activity (*id.*).

Kalafat considered filing a motion to prevent the government from bringing the 78 pounds of marijuana into the courtroom but decided the motion would be unlikely to succeed given the government's burden of proof (JA 793). In any event, Kalafat "did not think that the marijuana would have a prejudicial effect on the jury and [he did] not believe that it did" (*id.*). Instead, when the marijuana was wheeled into the courtroom, several jurors had "bemused looks on their faces" (*id.*). Kalafat also believed that this evidence would support the notion that Browne was a naïve operator rather than a sophisticated criminal who would carry a gun and kidnap someone (*id.*). The sheer scale of the physical evidence related to the marijuana would also stand in stark contrast to the lack of evidence on the kidnapping, particularly given the government's inability to produce the gun (*id.*).

### 3.    Farrelly

Farrelly had represented approximately 700 criminal defendants since 2012 and had participated in about 10 criminal jury trials and approximately 50 bench trials and similar proceedings (JA 795). He confirmed that the defense strategy was not to present an affirmative defense and that Farrelly and Kalafat had discussed that strategy with Browne (*id.* at 797). Farrelly favored this strategy because the government's case rested almost entirely on Flores's account, which Farrelly believed was inconsistent in several respects (*id.*). Farrelly also noted Flores's motive to fabricate given the possibility of the U-visa and the fact that no gun was recovered (*id.* at 797-98). In sum, "[t]here were multiple avenues to attack the complainant's credibility" (*id.* at 798). Because there was "ample argument to make regarding reasonable doubt in this case," Farrelly "did not want to muddy the waters by presenting an affirmative defense" (*id.*). In Farrelly's experience, "it is often better to put the government to its burden of proof beyond a reasonable doubt in a case like this one where there are significant holes in the government's evidence" because "[w]hen a criminal defendant puts up an affirmative defense, the jury will inevitably compare the defendant's case

14

to the government's case and weigh the credibility of the defendant's witnesses versus the government's witnesses" (*id.*). Those comparisons can lead the jurors, "consciously or not and despite instructions from the Court, to place a burden on the defense that would not otherwise exist" (*id.*). Farrelly also confirmed that Browne did not want to testify because he did not want to reveal his drug-related activities, which Farrelly advised him would be a topic on cross-examination should he take the stand (*id.* at 798-99).

Farrelly did not recall speaking with Browne about Sands potentially testifying, and he did not speak with Sands before trial (JA 799). Farrelly noted that Sands only spoke with Browne on the way to Aberdeen, when no criminal activity was alleged, and Flores's testimony at trial had established that the conversation had taken place anyway (*id.*). Moreover, Sands was Browne's childhood friend and subject to bias cross-examination (*id.*).

Farrelly spoke with Keslow both before and during trial (JA 799). He recalled discussing with Browne the possibility that Keslow could testify, but Browne did not feel strongly about it (*id.*). Like Sands, Keslow was a childhood friend and subject to bias cross-examination (*id.*).

Farrelly did not believe that any benefit from Keslow's testimony outweighed "the pitfalls of presenting an affirmative defense," especially given Keslow's bias (*id.* at 799-800). Moreover, because Browne did not testify, there was no need for Keslow to corroborate him (*id.*). Otherwise, Keslow's testimony that he was on the phone with Browne was not particularly helpful because it was undisputed that Browne had been on the phone during some of the relevant time (*id.*). "Keslow's testimony that he had an ordinary telephone conversation with Mr. Browne at this time would not be inconsistent with [Flores's] testimony" (*id.* at 800). Flores did not say that "Browne became angry, loud or aggressive; rather, he stated that Mr. Browne was calm (and on the phone) during the incident" (*id.*).

Farrelly also reviewed the information from Browne's phone (JA 801). He did not recall that Browne had visited webpages for escorts during his ride back to D.C. (*id.*). He noted that Flores's testimony and the video evidence would establish that Browne was on the phone to and from Aberdeen in any event (*id.*). Although Farrelly believed that Browne's phone use "made the armed kidnapping allegations less

probable," he "did not believe that the nature of that phone use was particularly relevant" (*id.*).

Farrelly did not advise Browne to take a blind plea to the marijuana charge because he "believed that some or all of the drug evidence would come into the trial even if the defendant pled to that charge beforehand, because the government's theory of the case was that the kidnapping was committed in furtherance of drug trafficking" (JA 801). Farrelly did not think that a motion to exclude the drug evidence from the trial would succeed, and he pointed to many of the same considerations that Kalafat did (*id.* at 801-02). Like Kalafat, Farrelly did not think that the government's evidence was strong regarding the kidnapping, but, in his experience, juries do not want to completely exonerate a defendant who is obviously involved in some criminal activity (*id.* at 802). "Going to trial on all of thencharges," however, "gave the jury the option of convicting [Browne] on the drug charge but acquitting him of the others" (*id.*). Thus, "[g]iven that some or all of the drug evidence was likely to come in anyway, [Farrelly] believed that allowing the jury to convict on that charge, as opposed to pleading to it beforehand, would make an acquittal on the kidnapping charges more likely" (*id.*).

### *The Evidentiary Hearing*

### 1.    Keslow

Keslow denied that he was talking with Browne about encrypting emails, as Flores had claimed, and stated instead that he was talking with Browne about cryptocurrency (JA 931-32). Although Keslow did not hear an argument between Browne and Flores, he admitted that he could not hear the specifics of their conversation (*id.* at 932). He claimed that he was unaware of the scope of Browne's drug activity, even though Browne was his best friend, and they talked every day (*id.* at 928-31, 937, 940-41). He also claimed not to know why Browne had moved from Los Angeles, where they roomed together, to Washington, D.C. (*id.* at 941-42).

Sands did not testify at the hearing (JA 1194 n.3).

### 2.    Kalafat

Kalafat testified consistently with his declaration. Kalafat noted that Browne mentioned Keslow as a friend but did not raise the possibility of him testifying, at least to Kalafat (JA 823). Thus, Kalafat did not consider calling Keslow to testify, and he did not interview him (*id.*). There was no dispute that Browne had talked with Keslow on the

phone during the ride back to D.C. from Aberdeen (*id.* at 824-26). Keslow did not see much value in interviewing Keslow because Flores did not testify to the specifics of the conversation and any impeachment value that Keslow could provide was minimal (*id.* at 827).

Kalafat did not think that Browne's viewing of adult escort websites on the way back to D.C. was particularly useful because that activity did not preclude Browne from pointing a gun at Flores at the same time (JA 836, 843-44). Moreover, Browne's viewing of the websites would potentially have made him look worse to the jury, especially if it concluded that Browne was "so cavalier as to be scrolling through pornography at the same time as holding the pistol" (*id.* at 844). Kalafat also rejected the idea that he and Farrelly were ambushed by that information due to any late discovery; he and Farrelly knew from Browne himself that Browne had talked to individuals on the phone during the events in question and that he had been browsing adult websites on the ride back to D.C. (*id.* at 845).

Kalafat confirmed that he considered whether Browne should blind plead to the marijuana charge but decided against it because the marijuana activity was too intertwined with the evidence of the

kidnapping (JA 855-56). Browne had clearly traveled to Aberdeen to obtain marijuana and then allegedly kidnapped Flores so that he could return to his marijuana stash (*id.*). There was "no way a trial judge would keep the [g]overnment from asking questions that had to do with the marijuana" (*id.* at 856).

Moreover, pleading guilty to the marijuana charge would have taken it "off the table" as a charge on which the jury could convict instead of the kidnapping (JA 857). Further, Kalafat thought that "the absurdity of 78 pounds showing how naïve Mr. Browne was . . . could be helpful for us" (*id.* at 858). Indeed, Kalafat saw that the jurors were amused by it (*id.*). The strong smell alone, and Browne's willingness to have that smell emanate from his apartment, showed that Browne was "not a sophisticated drug dealer who is going to be doing everything he can to protect his business and protect himself," like "have a gun" (*id.* at 862). In addition, the volume of the physical evidence regarding the marijuana charge contrasted with the lack of physical evidence regarding the kidnapping charge, including the government's inability to produce the gun (*id.* at 927).

Kalafat did not object to the jury instruction regarding number of witnesses because he did not want to unnecessarily highlight the fact that the government had more witnesses than the defense (JA 882-83). Moreover, Kalafat believed that the fact that the government had so many witnesses for the marijuana count but fewer witnesses for the kidnapping worked to the defense's advantage (*id.* at 883).

Kalafat confirmed that he did not offer an affirmative defense theory of the case because he wanted each individual juror to be able to have his or her own defense theory rather than being limited to just one, such as that Flores made up the kidnapping to obtain a U-visa (JA 880-81). Focusing the jury only on Flores's credibility carried the risk that a jury sympathizing with Flores might be reluctant to acquit (*id.* at 926-27). A broader, reasonable-doubt approach would enable the jury to find other reasons to acquit, based on the fact that the government had never found the gun, the government's burden of proof, and the possibility that Flores had simply been mistaken (*id.* at 925-27). Kalafat did not know if he was aware that Flores had overstayed his visa at the time of trial (*id.*

at 883).[5] If he had been aware, he would have considered whether to ask for the jury instruction regarding impeachment by proof of a pending case (*id.* at 883-84).

### 3. Farrelly

Farrelly also testified consistently with his declaration. He did not specifically remember Sands being mentioned before trial (JA 965). Browne did mention Keslow, but Farrelly did not remember whether Browne had described his conversation with Keslow (*id.* at 965-66). Farrelly believed he talked with Keslow on the phone one or two times before trial, but not in any depth because, at that time, Farrelly and Kalafat knew that Browne would not testify and that they would be presenting a reasonable-doubt defense (*id.* at 966-67). Like Kalafat, Farrelly did not want to put on evidence for fear that the jury members would shift from thinking about the case in terms of reasonable doubt to thinking of it in terms of which side they believed (*id.* at 969-71). Further, Keslow's testimony would only provide "marginal value at best"; he could corroborate only that Browne had been on the phone on the way back to

---

[5] Even if Kalafat was unaware of it, Farrelly was not. He cross-examined Flores on the fact that Flores had overstayed his visa (JA 288).

D.C. and would be cross-examined regarding his bias for Browne (*id.* at 1022-23).

Farrelly confirmed that he reviewed the discovery regarding Browne's phone (JA 975). He already knew that Browne was using his phone for most of the trip, and he did not expect that it would be contested at trial (*id.* at 976-77). The records simply "confirmed what [Farrelly and Kalafat] already knew" (*id.* at 978). Farrelly also expected that Flores's testimony would establish that Browne was on the phone for most of the ride back to D.C. (*id.* at 980-81). Ultimately, the phone evidence did not "really change[] anything for [the defense] as far as strategy" because the evidence was "not compelling enough to warrant introducing an affirmative defense case" (*id.* at 987).

Regarding the marijuana, Farrelly noted that because "the [g]overnment's theory was clearly that this kidnapping was effectuated and was motivated by Mr. Browne's engagement in these drug-dealing activities," there was "really no realistic scenario" where the court would have excluded evidence of Browne's involvement in the drug conspiracy (JA 992). Further, leaving the marijuana charge in the trial "gave the jury something to convict [Browne] of" other than the kidnapping (*id.* at

993-94). In fact, the "overwhelming" evidence of the marijuana activity would contrast with the "nowhere near as powerful" evidence of the kidnapping (*id.* at 994). Farrelly confirmed that he told Browne this strategy "several times" before trial (*id.* at 998). In any event, Farrelly did not think that the jury convicted Browne of the kidnapping just because the government "brought in a couple boxes of weed" (*id.* at 1001). He agreed with Kalafat that the jury seemed amused by the amount (*id.* at 1002).

Farrelly thought that there were multiple weaknesses in the kidnapping case (JA 1016). Even though Flores's motivation to fabricate to get a U-visa was one "powerful argument," Farrelly also pointed to his belief that it would have made little sense for Browne to book a Lyft with his own name and address and then kidnap Flores, who knew where Browne lived (*id.* at 1016-17). Moreover, Flores's account was arguably inconsistent with the McDonald's surveillance and the government never recovered any gun (*id.* at 1016).

### 4.    Browne

Browne claimed that Farrelly and Kalafat did not go over the marijuana strategy with him and that he wanted to take responsibility

for the marijuana activity, but Farrelly and Kalafat told him that there was nothing that they could do about that count (JA 1054). He also claimed that, shortly before trial, he told Farrelly and Kalafat that he wanted to testify but that Farrelly dissuaded him from doing so because he was not prepared to testify, and the government would ask Browne for whom he worked (*id.* at 1078-80). Browne admitted that they were "absolutely right" and that he "didn't know what to do" (*id.* at 1080). He was also concerned that if he took the stand, he could make statements that would potentially lead to more narcotics charges (*id.* at 1097-1100).[6] Browne also claimed that he told his lawyers about Sands and Keslow as potential witnesses (*id.* at 1113-14). He thought that they could be "helpful," perhaps even as character witnesses, but he did not provide more detail (*id.* at 1114).

## The District Court's Order

The district court denied Browne's motion (JA 1184). It credited Farrelly's and Kalafat's testimony (*id.* at 1186-87). It found Keslow's

---

[6] At trial, Browne confirmed with Judge McFadden that he did not want to testify and that he had had enough time to discuss the issue with his attorneys (JA 1084-85).

testimony to be "probative, though in parts incredible," and it credited trial counsels' testimony over Keslow's testimony when the two differed (*id.* at 1187-88). It also found Browne's testimony to be "probative" but "evasive at times" (*id.* at 1188). The district court noted that Browne had "a strong incentive to distort the truth in these proceedings—doing so might secure him a new trial" (*id.*). Accordingly, the district court credited trial counsels' testimony over Browne's when the two conflicted (*id.* at 1188). The court noted that "[w]hile Browne appears to be a likeable and even gentle person, he did not appear to be a trustworthy one. And that is what matters here." (*Id.* at 1188-89.)

The district court rejected Browne's claim that he had not discussed trial strategy with his counsel, noting his contradictory testimony on that matter (JA 1190). Regarding Keslow and Sands, the district court found that trial counsel knew the substance of their potential testimony before trial (*id.* at 1192). Farrelly spoke with Keslow before trial[7] and both counsel knew that Browne was on the phone on the way to Aberdeen (*id.* at 1192-93). It further found that Farrelly's judgment that Keslow's and

---

[7] To the extent that Keslow testified otherwise, the district court discredited that testimony (JA 1192 n.2).

Sands's testimony would be "of limited impeachment value" was "reasonable" (*id.* at 1193). Even if Keslow had testified that he did not hear an argument, this testimony would not necessarily conflict with Flores's account because Flores stated that Browne ordered Flores to drive him at gunpoint in a "very normal" tone (*id.*). Sands's potential testimony that he and Browne did not discuss email encryption, as Flores had claimed, was easily explainable as Flores was likely mistaking cryptocurrency with email encryption (*id.*). Moreover, Sands was only on the phone with Flores on the way to Aberdeen and thus "could not have contradicted Flores's account of the actual offense conduct" (*id.* at 1194). The district court noted that trial counsel reasonably decided not to put on these witnesses and reasonably chose to argue reasonable doubt instead of presenting an affirmative defense case (*id.*). Such an "informed tactical decision" is "'virtually unchallengeable'" (*id.* at 1195 (quoting *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984)). The district court likewise found it reasonable for the defense to not ask for a defense-theory jury instruction given its emphasis on its reasonable-doubt defense (JA 1198).

Regarding the marijuana evidence and the blind plea, the district court found that "counsel considered these options but made a strategic choice not to pursue them" (JA 1196). The court outlined those strategic considerations: (1) Browne would not be able to keep out all of the marijuana evidence because the kidnapping and drug-distribution charges were related; (2) the 78 pounds of marijuana would help portray Browne as naïve and therefore less likely to commit a violent kidnapping; and (3) trying the marijuana charge would allow the jury to convict Browne of something, given that he was obviously involved in criminal activity, without convicting him of the more serious charges (*id.* at 1196-97). The court found these strategies to be within the wide range of reasonable professional assistance (*id.* at 1197). Indeed, the court noted that it "likely would have denied a categorical motion in limine and allowed the Government to present much of its drug trafficking evidence," even if Browne had blind pled, because the narcotics evidence was "probative of Browne's motive in kidnapping Flores" (*id.*). The blind plea option, therefore, was "a dubious gamble hoping to exclude evidence with probative value, all at the cost of losing a 'compromise' conviction" (*id.* at 1197-98). Moreover, the district court noted that "introducing

massive quantities of marijuana evidence may have cut *against* the Government. Members of the jury seemed to find its presence amusing—several jurors smirked when it was brought into the courtroom." (*Id.* at 1198 (emphasis in original).)

Regarding the phone evidence, the district court found that trial counsel reviewed those records but "determined they were largely cumulative of evidence that would be admitted in the Government's case-in-chief" and, in any event, would have undermined counsel's reasonable strategy to pursue a reasonable-doubt defense (JA 1199). Indeed, counsel's strategy was "particularly reasonable" on this point because "[a] jury might have drawn inculpatory inferences from Browne seeking out illegal prostitution" or "may have inferred dishonesty from Browne seeking out escorts while telling [his then-girlfriend] he wanted an exclusive relationship" (*id.* at 1199). And "of course, it is entirely possible to scroll one's phone while holding something in the other hand (like a gun)" (*id.* at 1199-1200).

The district court also found that trial counsel did not perform deficiently when declining to object to the prosecutor's leading questions for Flores or to testimony from a narcotics expert (JA 1200). The court

saw Flores's testimony during trial and noted that he spoke "weak English" (*id.*). Thus, the government had to "clarif[y] [his] answers with summarizing and leading questions" (*id.*). Had the defense objected every time the government clarified one of Flores's answers, "it may have come across as derogatory nitpicking based on Flores's incomplete command of the language" (*id.*). Moreover, objections would not have excluded most of Flores's inculpatory testimony; objections would have only prolonged it (*id.*). There was also no deficiency in failing to object to the expert testimony because the expert properly opined that firearms are often used in drug trafficking (*id.* at 1201).

Finally, the district court found that, even if Browne's lawyers were deficient, Browne was not prejudiced (JA 1201). The evidence that counsel failed to pursue was either cumulative or of limited impeachment value (*id.* at 1202). And, even after defense counsel thoroughly impeached Flores, he still came across as "a compelling, sympathetic witness and the jury believed his testimony" (*id.*). Further, counsel's decision not to pursue a blind plea or move to exclude the narcotics evidence was "probably affirmatively correct," and, in any event, would have removed the jury's ability to reach a compromise conviction on the

less-serious count (*id.*). Had defense counsel objected to Flores's or the expert's testimony, meanwhile, the court would have overruled the objection to the expert and simply asked government counsel to rephrase questions to Flores (*id.*).

In sum, defense counsels' strategic "gamble largely succeeded— Browne was convicted on only two of seven counts in a felony indictment, leading to a far shorter sentence than he might have faced" (JA 1203). Indeed, Browne received a sentence after trial that was less than the prison time he would have faced if he had accepted the government's plea offer (JA 1203). The district court found that "the more-developed factual record suggests an alternative strategy may have hurt Browne's case. Had the Defense decided to offer an affirmative theory of the case, and offered potentially prejudicial evidence like the pornographic searches, and blind pled to the narcotics charge, there is a very real chance Browne could have ended up with a far worse outcome." (*Id.*)

## SUMMARY OF ARGUMENT

Browne did not establish that his counsel rendered constitutionally ineffective assistance at his trial. Having credited counsels' testimony at the remand hearing, the district court correctly concluded that counsel

made reasonable strategic choices in defending Browne against the most serious charges against him. Specifically, Kalafat and Farrelly would not have been able to exclude the marijuana evidence, and the admission of the 78 pounds of marijuana gave them an opportunity to portray Browne as a naïve operator who would not commit an armed kidnapping. Counsel also reasonably declined to pursue a plea to the marijuana count because that charge enabled counsel to highlight the relative paucity of evidence supporting the kidnapping counts, while giving the jury an opportunity to convict Browne of the less-serious marijuana charge to hold Browne accountable for his involvement in  criminal activity.

Browne failed to show that counsel rendered ineffective assistance by failing to sponsor testimony from his childhood friends Sands and Keslow. Their testimony would have provided weak impeachment of Flores's account. And that scant impeachment value did not justify abandoning a generally accepted and sound reasonable-doubt strategy. Nor was counsel ineffective for not introducing evidence that their client had viewed over 50 pornographic and escort-services websites while holding a gun to someone's head, especially considering that Browne did

so shortly after telling his then-girlfriend that he wanted to be faithful to her.

Trial counsel was also not ineffective regarding objections, jury instructions, its defense theory, and closing argument. Objecting to the leading questions of Flores would have only prolonged the direct examination while increasing the jury's sympathy for Flores. Any objections to a government expert's testimony would have been overruled. Counsel reasonably decided against calling attention to the imbalance of witnesses by instructing the jury on that issue. Similarly, counsel did not fall short in declining to request a specific instruction related to impeachment of Flores due to his pending immigration matter. The trial court reasonably found this instruction was not applicable and, in any event, the substance of the instruction was covered by other instructions. And counsels' decision to pursue a general reasonable-doubt theory rather than simply focus on Flores's visa issues gave the jury multiple avenues to acquit. In any event, counsel repeatedly conveyed to the jury that Flores's visa situation was a reason to disbelieve him.

Finally, even if counsel were deficient in some respect, Browne cannot show prejudice. Counsels' strategic decisions worked to Browne's

benefit. Indeed, Browne was acquitted of the armed kidnapping and the firearms offenses. He received a sentence that was less than the one contemplated in the plea offer. Rather than perform ineffectively, counsel's decisions likely prevented a far worse outcome for Browne.

## ARGUMENT

### Browne Failed to Establish that Trial Counsel Rendered Ineffective Assistance.

Browne claims that Farrelly and Kalafat were ineffective for (1) not moving to exclude the 78 pounds of marijuana brought into the courtroom and not having Browne blind plead to that charge, (2) failing to call Keslow or Sands to testify, (3) failing to present evidence showing Browne's phone usage, including adult website searches, during the kidnapping, (4) failing to object to the prosecutor's leading questions and the testimony of the government's expert, (5) failing to request jury instructions regarding the number of witnesses and the consideration of pending cases, and (6) failing to present an affirmative defense theory of the case. The district court carefully considered these contentions and correctly rejected them.

## A.  Standard of Review and Applicable Legal Principles

To establish ineffective assistance of counsel, the defendant "bears the burden" to show "that the attorney's error was 'so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment'" and that the error "prejudiced the defense." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (quoting *Strickland*, 466 U.S. at 689). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* (quoting *Strickland*, 466 U.S. at 690). And, even if counsel's performance fell below prevailing professional norms, a defendant cannot obtain relief absent a showing that the "likelihood of a different result" was "substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citing *Strickland*, 466 U.S. at 693). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

This Court reviews the district court's rulings on ineffective assistance claims de novo. *United States v. Doost*, 3 F.4th 432, 437 (D.C. Cir. 2021).

### B.    Discussion

### 1.    The Marijuana and the Blind Plea

Farrelly and Kalafat were not ineffective regarding the marijuana strategy. As the district court noted, Browne would not have been able to exclude the marijuana evidence because it was intertwined with the kidnapping evidence (JA 1196). Browne hired Flores to complete a drug run between Washington, D.C., and Aberdeen, Maryland. When he arrived in Aberdeen, Browne redirected Flores from a motel to a McDonald's parking lot, then waited suspiciously in the McDonald's, then returned to Flores's car with a suitcase he had not had previously (JA 91-92, 105). That suitcase resembled the multiple suitcases that police found in Browne's apartment, many of which contained large amounts of marijuana. *See Browne*, 953 F.3d at 797-800 (noting that the kidnapping and marijuana evidence were "connected" because Browne obtained a suitcase in Aberdeen and police later found several suitcases containing marijuana in his apartment).

36

The nature of Browne's trip to Aberdeen provided his motive for kidnapping Flores—concerned that he would be stranded far from D.C. with a large amount of marijuana, Browne made sure that Flores drove him back so that Browne could hide his valuable contraband with the rest of his product. *See* JA 1197 (district court confirms that "[t]he narcotics evidence was, after all, probative of Browne's motive in kidnapping Flores"). As Kalafat reasonably concluded, there was "no way a trial judge would keep the [g]overnment from asking questions that had to do with the marijuana" (JA 856); *see also* JA 1197 (district court confirms that "[h]ad Browne pled guilty to the narcotics charge, the Court likely would have denied a categorical motion in limine and allowed the Government to present much of its drug trafficking evidence anyway").[8]

Given that reality, the marijuana presented counsel with an opportunity to both portray Browne as a naïve operator and to give the jury a less damaging count upon which to convict. Browne had an absurd amount of marijuana stored in his apartment despite the obvious smell

---

[8] Indeed, at the evidentiary hearing, Browne's current counsel admitted that at least some marijuana evidence would have been admitted at trial. *See* JA 1176 ("I completely agree some will come in.").

that permeated from it. He apparently had taken few precautions to hide the marijuana, choosing instead to simply pile it into multiple suitcases. *See Browne*, 953 F.3d at 798. Moreover, Browne hired a Lyft driver whom he did not know to drive him all the way to Aberdeen, Maryland, to commit a drug transaction. Based on those facts, counsel reasonably attempted to portray Browne as "in over his head" rather than a sophisticated criminal capable of committing a violent armed kidnapping (JA 867, 1196).

Moreover, leaving the marijuana charge in the trial gave the jury an opportunity to convict Browne for something, given that he was obviously involved in some criminal activity. As trial counsel noted, the evidence of marijuana distribution was strong, but the evidence of the kidnapping was weaker (JA 927). Counsel reasonably planned for the jury to contrast the disparate evidence and decide that, although Browne was clearly involved in some criminal activity, the government had not proved the kidnapping beyond a reasonable doubt. Nor did Kalafat and Farrelly decide on this strategy on a whim or a hunch; rather, they drew on their prior experience interviewing multiple juries that had indicated that "they often do not want to grant a complete acquittal to someone

who is clearly involved in criminal activity" (*id.* at 793, 802). Browne has not presented any evidence from a defense attorney in contradiction.[9]

Browne nonetheless argues (at 33) that Farrelly and Kalafat's strategy was unreasonable because it involved "criminal propensity evidence portraying [Browne] as a criminal," thus making it more likely that the jury would convict him of the kidnapping. However, Browne would not have been able to meaningfully limit the marijuana evidence. No matter what, the jury would have learned that Browne was a drug dealer. And evidence that Browne sold marijuana does not logically lead

---

[9] To the extent that Browne argues (at 31) that his trial counsel rendered ineffective assistance for not advising him to enter a blind plea, his argument is misplaced. Farrelly confirmed that counsel spoke with Browne about their marijuana strategy multiple times (JA 998). Farrelly also testified that he thought he discussed the blind-plea option with Browne, but he was not sure (*id.*). Even if trial counsel did not explicitly discuss the possibility of blind pleading, however, trial counsel was not ineffective for not doing so. Trial counsel generally has a duty to communicate plea offers from the government, *see Missouri v. Frye*, 566 U.S. 134, 145 (2012), but here there was no plea offer to just the marijuana count. Trial counsel must also inform a defendant about the "clear and easily determined" consequences of pleading guilty (or not), *see United States v. Aguiar*, 894 F.3d 351, 358 (D.C. Cir. 2018) (internal quotation marks omitted), but there is nothing clear and easily determined about blind pleading to the marijuana charge. Rather, as the district court found, "[i]t would have been a dubious gamble hoping to exclude evidence with probative value, all at the cost of losing a 'compromise' conviction" (JA 1197-98).

to the "propensity" inference that Browne would also commit a violent kidnapping. The two are very different. *See, e.g.*, *Scott v. United States*, 954 A.2d 1037, 1041-43 (D.C. 2008) (no error in admitting other-crimes evidence consisting of 65 bags of marijuana in a shooting case, even though the defendant claimed "it could only portray him to the jury as a drug dealer," because "the degree of prejudice that appellant might face if the jury concluded that he . . . possessed drugs was minimal"). Indeed, Judge McFadden, Farrelly, and Kalafat have all confirmed that the jury was amused when the 78 pounds of marijuana were wheeled into the courtroom. *See* JA 1198 n.5 (Judge McFadden: "In fact, introducing massive quantities of marijuana evidence may have cut *against* the Government. Members of the jury seemed to find its presence amusing— several jurors smirked when it was brought into the courtroom." (emphasis in original)); *id.* at 858 (Kalafat confirms "100 percent" that jurors were amused by the scale of the marijuana); *id.* at 1002 (Farrelly agrees that the jury was amused).

As the district court found, given these considerations, "[t]here's no basis to conclude that [trial counsel's] strategy was outside 'the wide range of reasonable professional assistance'" (JA 1197 (quoting *United*

*States v. Mohammed*, 863 F.3d 885, 889 (D.C. Cir. 2017)).[10] Rather, Farrelly and Kalafat executed a reasonable strategy to try to use the marijuana charge to obtain an acquittal on the kidnapping charges, and they largely succeeded.[11]

## 2.   Sands and Keslow

Trial counsel was not ineffective for declining to call Sands or Keslow to testify. Although Browne now warns (at 41) that "[m]ake no mistake, Sands was important," his current counsel claimed otherwise at the evidentiary hearing. See JA 1130 ("I don't think Bryant Sands was decisive."). Trial counsel explained that he did not call Sands "because it

---

[10] As this passage demonstrates, Browne's claim (at 33) that "[e]ven the district court remarked that [trial counsel's] strategy was unreasonable" is incorrect. Browne's brief quotes the district court asking questions of the lawyers during oral argument on the motion (JA 1167). When ultimately deciding the matter, the district court's Memorandum Order explained that trial counsel's strategy was reasonable (JA 1197).

[11] Browne suggests (at 33-34) that he also suffered prejudice at sentencing because he did not blind plead. But his marijuana sentence ran concurrently with his kidnapping sentence (JA 19). Browne's kidnapping sentence determined the amount of time he will serve, and the length of his marijuana sentence made no practical difference. Indeed, Browne conditions (at 34) his prejudice argument on the assumption that he would have been acquitted on the kidnapping charge had he entered a blind plea to the drug offense. That argument fails for the reasons discussed herein.

was uncontested that [Sands] wasn't interviewed" and that "there's nothing disputed in his declaration" (*id.* at 1129). As the district court noted, "the only record evidence of Sands's potential testimony is his short declaration. Without more, it is difficult to assess his credibility or determine his value as a potential impeachment witness." (*Id.* at 1194 n.3.)

Given the record here, Browne cannot show that trial counsel was ineffective with respect to Sands's potential testimony. Although trial counsel did not remember Sands's name specifically, they knew that Browne had spoken to someone on the phone on the way to Aberdeen (JA 790, 799, 838-40, 965).[12] Counsel reasonably concluded, however, that this witness would not add anything meaningful to the trial (*id.* at 790, 799, 840); Sands only spoke with Browne on the way to Aberdeen and would not have been able to contradict Flores's account of the kidnapping

---

[12] Browne claims (at 28-29) that the fact that counsel did not remember Sands's name meant that they did not study Browne's phone records. The record belies this claim. Trial counsel confirmed that they reviewed the phone records, but the records did not tell them anything that they did not already know (JA 791, 801, 825, 845, 975, 978). Counsel already knew that Browne had spoken to someone on the phone on the way to Aberdeen (*id.* at 838-40, 965); the specific name was not important.

(*id.* at 1193-94). Moreover, even if Sands had testified that he did not discuss encrypting emails with Browne, as Flores had claimed, that discrepancy was readily explainable (*id.* at 90, 780). Flores's English was "weak," and he could have easily confused encrypting emails with the cryptocurrency discussion that Keslow claimed to have had with Browne (*id.* at 782, 1193, 1200). In sum, as the trial court found, Sands's testimony would have been "of only minor impeachment value" (*id.* at 1194).

The same is true regarding Keslow. Browne claims (at 29) that trial counsel did not "interview" him, but Farrelly testified that he spoke with Keslow one or two times before trial (JA 966).[13] Counsel also already

---

[13] Browne claims (at 29) that "it is factually undisputed that neither counsel interviewed Keslow." Farrelly's full testimony, however, does not make such a concession. First, as noted supra, Farrelly spoke with Keslow before trial. Farrelly further testified that he was "sure" that he and Keslow discussed what Keslow and Browne had talked about on the phone (JA 966). When told that Keslow claimed that Farrelly had never interviewed him, Farrelly only stated that he did not "dispute" Keslow's claim and that Keslow "could be accurate," but that Farrelly could not be certain (*id.* at 967-68). That equivocal testimony does not establish that no substantive discussion took place, and Farrelly's original comments suggest otherwise. Accordingly, the district court found that Farrelly had had a "substantive" discussion with Keslow, whether that discussion was classified as a "conversation" or an "interview" (*id.* at 1192 n.2). The

(continued . . . )

knew that Browne had had phone conversations on the way back to D.C. from Aberdeen (*id.* at 824, 826, 839, 976-77, 1022). Keslow's evidentiary value was scant. Even if he testified that he never heard Flores and Browne arguing (JA 782, 932), that testimony would not have conflicted with Flores's account. Flores testified that Browne pointed a gun at him and said "drive me back to D.C." in a "very normal" tone (*id.* at 115, 117). Further, Keslow admitted that he could not hear the specifics of Browne and Flores's discussions (*id.* at 932). Keslow's testimony that he spoke with Browne about bitcoins and cryptocurrency, rather than software to protect emails as Flores stated, is at most a small discrepancy that is again explainable by Flores's weak English (*id.* at 120-21, 931-32, 1200). Indeed, according to Farrelly, even Browne did not have strong feelings about Keslow testifying before trial (*id.* at 799).

More importantly, Keslow's tenuous potential impeachment testimony did not justify abandoning a sound and generally accepted defense strategy. Counsel decided that the best course was a reasonable-doubt defense (JA 966-67). Although Browne now attacks (at 30) this

district court "credit[ed] trial counsel's impression of [the] status of these interactions, not those of the lay witnesses" (*id.* at 1192 n.2).

strategy as "ineffective," that strategy made sense here. As Farrelly explained, the government's evidence on the kidnapping charge was "not that strong" and defense counsel could point to the government's high burden of proof rather than offer defense evidence and risk the jury "abandon[ing]" the reasonable-doubt standard and instead "apply[ing] more of a preponderance or 'Which side do I believe more' type" of standard (*id.* at 967, 969-70). Kalafat echoed that sentiment: "If the defendant offers an affirmative defense . . . , the jurors are . . . left to choose between two competing narratives" rather than "focus . . . on the government's high burden of proof" (*id.* at 788-89).[14]

That strategy is not unreasonable—it is easy to imagine that when a juror hears evidence from both sides, he or she may, even unconsciously, begin to think of the case as a conflict between two

---

[14] Browne's argument (at 34) that "calling Keslow for impeachment purposes does not shift the government's reasonable doubt burden" misses the point. The point is not whether the burden literally shifts, which, as trial counsel understood, never happens (JA 970, 1195 n.4). The point is that, as a practical matter, introducing an affirmative defense through witness testimony risks inviting the jury to weigh two conflicting accounts and, even unconsciously, begin to think about the case more in terms of which account they believe rather than focusing on the government's high burden.

45

accounts and weigh the minimal power of impeachment testimony against the stronger substantive evidence offered by the government. Accordingly, as Farrelly testified, sticking to the reasonable-doubt strategy and declining to offer any evidence is "generally accepted in the criminal defense community" (JA 969). *See Harrington*, 562 U.S. at 109 ("To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates."). And, as the trial court found, "[t]hat's exactly the kind of informed tactical decision *Strickland* says is 'virtually unchallengeable'" (JA 1195 (quoting 466 U.S. at 690-91)).

### 3.    The Adult-Website Searches

Trial counsel was not ineffective for declining to inform the jury that Browne had viewed over 50 pornographic and escort-services websites shortly after texting his then-girlfriend that he wanted to be faithful to her (JA 40, 42-43, 1035-36). The prejudice from that evidence is clear. The evidence becomes even more damaging when, as Kalafat noted, it suggests that Browne was "so cavalier as to be scrolling through pornography at the same time as holding the pistol" (*id.* at 844). And

contrary to Browne's arguments (at 37), as the district court found, "it is entirely possible to scroll one's phone while holding something in the other hand (like a gun)" (*id.* at 1199-1200). The adult-website evidence therefore had little to no exculpatory value, but clear prejudicial effect. "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Harrington*, 562 U.S. at 108. Further, the introduction of that evidence would undermine trial counsel's pure reasonable-doubt defense, as discussed supra. There was no reason to abandon that strategy to introduce evidence that would have likely harmed Browne's defense.

### 4.    Miscellaneous Objections

Trial counsel was not ineffective for failing to object to the prosecutor's leading questions for Flores. As the district court—which saw Flores's testimony—found, Flores "spoke weak English, which meant the Government often clarified answers with summarizing and leading questions" (JA 1200). Had defense counsel objected every time the government clarified one of Flores's answers, "it may have come across as derogatory nitpicking based on Flores's incomplete command of the language" (*id.*). Moreover, the objections would not have excluded most

of Flores's inculpatory testimony; objections would have simply "prolonged it" (*id*). Thus, repeated objections would not only have failed to help Browne, they may have also made him look petty before the jury. Trial counsel was not deficient for avoiding that outcome.

Counsel was also not deficient for declining to object to Sgt. Alvin Cardinal's testimony about the connection between firearms and narcotics (JA 622). The district court qualified Sgt. Cardinal as an expert, permitting him to discuss the habits of drug traffickers (*id.* at 604). Thus, as the district court found, "any objection to his testimony as 'speculation' would have been meritless" (*id.* at 1201). Indeed, this Court has repeatedly noted the connection between firearms and narcotics. *See, e.g., United States v. Booker,* 436 F.3d 238, 280 (D.C. Cir. 2006) ("government's drug expert testified about the unique relation between drug stashes and firearms, stating that one often 'can't do without the other,'" in accord "with [this Court's] prior caselaw, which 'has frequently recognized that guns and drugs go together in drug trafficking.'").[15] Trial

---

[15] Browne also claims (at 49) that Sgt. Cardinal called him a "wholesale dealer," but Sgt. Cardinal did not. He merely testified that "[a] wholesale dealer is going to have a larger amount of money" (JA 619). He did not specifically identify Browne as a wholesale dealer.

counsel was not deficient for not making a meritless objection. *See, e.g.*, *United States v. Marshall*, 946 F.3d 591, 596 (D.C. Cir. 2020).[16]

### 5.    The Jury Instructions

Browne argues (at 37) that trial counsel was ineffective for not objecting to the removal of D.C. Jury Instruction 2.111, which addresses imbalance of witnesses. As the district court noted, that instruction arguably does not even make sense in this situation. *See* JA 1147 ("[I]t didn't even make sense. It talks about: You might find that the fewer witnesses on the one side would be more persuasive than the more witnesses on the other. That doesn't make sense when you have zero witnesses on one side."); *see also* Criminal Jury Instructions for the District of Columbia § 2.111 (2022). Kalafat explained that he did not see

---

[16] Browne also briefly claims (at 50) that another detective "perjured himself" because he testified that he did not speak with Browne even though the detective had in fact done so (JA 485-86). Browne complains (at 50) that trial counsel should have cross-examined the detective on this fact. However, as the district court found, Browne "offers little explanation of why that detail was significant for impeachment purposes" (JA 1201 n.7). Browne still has not provided such an explanation on appeal. Given that the detective's testimony largely concerned matter-of-fact issues related to the execution of the search warrant and the narcotics evidence that was recovered, any cross-examination on that point would have been unlikely to have any effect, particularly on the kidnapping charge (*id.* at 485-518).

any need to object to the instruction's removal because it could only reinforce to the jury that the government had called more witnesses (JA 882-83). That is a highly plausible outcome as a practical matter and, at the least, would not constitute an unreasonable strategic decision. And in any event, most of the government's witnesses at trial concerned the marijuana charge, so the instruction would have had little impact on the kidnapping (*id.* at 883).

Browne also argues (at 37) that trial counsel was ineffective for not objecting to the removal of D.C. Jury Instruction 2.219, which concerns impeachment by a pending case or investigation. *See also* Criminal Jury Instructions for the District of Columbia § 2.219 (2022). Browne contends that this instruction was relevant as to Flores. However, Browne rehashes an argument that this Court rejected in the direct appeal. *See Browne*, 953 F.3d at 800-02 (rejecting Browne's argument, on plain-error review, that the district court erred by removing this instruction). As in his direct appeal, Browne continues to provide no authority that Flores's involvement in immigration proceedings means that he was "under investigation" within the meaning of the instruction. *See id.* at 802 ("Browne has failed to cite any authority that affirmatively supports his

argument that instruction 2.219 covers U-Visa applicants in the first place. Nor have we found any case stating that instruction 2.219 applies to testimony from U-Visa applicants during our own review. Absent legal authority stating such, it is not clear that U-Visa applicants are even 'under investigation' within the meaning of instruction 2.219."). In fact, Flores was in the deferred action program at the time of trial—meaning that he would not be deported while this case was pending (JA 148-51). Because Flories had not completed his U-visa application, let alone filed it, U.S. Citizenship and Immigration Services ("USCIS") officers could not possibly have been investigating it (*id.*). Trial counsel reasonably declined to insist on a jury instruction that, by all accounts, was inapplicable.[17] *See United States v. Gray-Burris*, 920 F.3d 61, 66 (D.C. Cir. 2019) (counsel not ineffective for failing to request a jury instruction where there was no evidentiary basis for it).

---

[17] Indeed, the district court noted that, during the post-trial proceedings, "Browne declined to brief the issue unless the USCIS produced relevant records" (JA 1201 n.7). Browne did not file any subsequent pleadings on the subject despite leaving open that possibility "if USCIS ends up producing anything worth arguing on this point" (JA 1201 n.7 (quoting Defendant's Mot. for a New Trial at 41 n.4)). "Without more," the district court could not "find a deficiency in [trial counsel's] non-objection[]" (JA 1201 n.7).

In any event, the district court issued standard jury instructions related to witness credibility and bias. *See Browne*, 953 F.3d at 801. The court instructed at length regarding what to consider in weighing credibility, including inconsistent statements and whether "any witness has shown him or herself to be biased or prejudiced for or against either side" (JA 652-54). Because the instructions adequately focused the jury on witness bias and credibility, Browne cannot show that counsel was deficient for failing to insist on Instruction 2.219. *See Browne*, 953 F.3d at 802 (rejecting Browne's claim that the district court plainly erred in removing Instruction 2.219 because "the issued instructions clearly focused the jury's attention on the issues of witness credibility, bias, and motive to falsify testimony").

### 6.    Defense Theory and Closing

Relatedly, Browne attacks (at 38-39) trial counsel for not presenting an affirmative defense theory of the case that Flores "was fabricating the armed kidnapping crime to secure a U-Visa." Browne contends (at 38, 51-53) that trial counsel should have done so in both jury instructions and closing.

As Farrelly and Kalafat explained, however, presenting an affirmative defense theory limits the defense to one possible reason for acquittal rather than give the jury multiple avenues (JA 788, 798, 880-81, 1016-17). The broad reasonable-doubt strategy enabled counsel to tell the jury to discredit Flores because he had an incentive to fabricate to get the U-Visa, while also allowing counsel to highlight that the government had never found a gun, that Flores had no corroboration for his account, that Flores's account had inconsistencies, and that Browne's decision to kidnap a Lyft driver who knew his name and home address was totally implausible (*id.* at 789, 797, 1016-17). Counsel reasonably presented multiple attacks on the government's case, thereby affording each juror to retain his or her own reason to acquit (*id.* at 880-81, 925-97). That strategy had added benefit here because it did not rely on the jury needing to conclude that Flores—who the district court described as "a compelling, sympathetic witness" (*id.* at 1202)—was a liar (*id.* at 926-97).

Further, Kalafat made it clear in his closing argument that the jury should consider Flores's immigration status as a potential source of bias and a reason not to credit his account. *See* JA 703 ("We are to believe that Mr. Flores, it never occurred to him that this would qualify him for a U-

visa. That this would stop him from being kicked out of our country this year, put off for a year while he's going through the U-visa program. We are to believe that it didn't occur to him despite the fact that just a couple of years ago his wife got a U visa and is now able to stay in our country through that process."); *id.* at 709 ("Mr. Flores, by persisting with this allegation, is now eligible for a U visa and to stay in our country. He was here ten years, unable or unwilling to get a visa to stay here. His wife went through the same process. He knows it in and out, and now he's going to be able to get it because he came in and testified. . . . His family's here. He wants to stay here. Hell with the drug dealer. Right? . . . Hell with him. Him or me."). Even the prosecutor reminded the jury that it had to consider Flores's immigration situation. *See id.* at 688 ("Of course, you have to consider the fact that he's got these immigration issues and there's this thing with the U visa . . . . Of course, you have to evaluate that. That's your job[.]"). The jury was thus aware that it could consider Flores's immigration status in weighing his credibility.

In sum, far from deficient, trial counsel's strategy benefited Browne by giving the jury as many reasons as possible to acquit him. Trial counsel could—and did—point to Flores's U-visa situation while also

giving the jury many other reasons to acquit. Accordingly, the district court was correct when it found trial counsel's strategy to be "reasonable" (JA 1198).

### 7. Prejudice

Finally, even if Farrelly and Kalafat were deficient in one or more respects, Browne cannot show prejudice. As discussed supra, the district court would have admitted most, if not all, of the marijuana evidence even if Browne had blind pled. Jurors were amused by the amount of marijuana. Sands and Keslow could only provide evidence that "was either cumulative or of limited impeachment value" (JA 1202). The adult-website searches would have prejudiced Browne more than they would have helped him. Objections to leading questions would have only prolonged Flores's inculpatory testimony rather than stopped it, and an objection to Sgt. Cardinal's testimony would have been overruled. The court adequately instructed the jury about witness bias and credibility, and there is no likelihood that either that instruction or the imbalance-of-witnesses instruction would have changed the jury's mind. Finally, trial counsel did tell the jury they should consider Flores's motive to fabricate given the U-Visa, along with many other reasons to acquit.

Trial counsels' "gamble largely succeeded—Browne was convicted on only two of seven counts in a felony indictment, leading to a far shorter sentence than he might have faced" (JA 1203). Indeed, his ultimate sentence of approximately 14 years was less than the plea offer for 16 to 19 years (*id*. at 19, 1203). And Browne was acquitted of the armed kidnapping, thereby showing that trial counsel's strategy to highlight multiple potential avenues to acquit—including the inability of the government to produce the gun—had merit. *See* JA 1125 (district court notes that the jury "could see it the . . . way, as arguably I saw it in sentencing, that [the jury was] quite convinced of the kidnapping, but just were troubled by the fact that [the government] couldn't find a gun and therefore felt beyond a reasonable doubt that the kidnapping occurred"). Relatedly, Browne was acquitted of the § 924(c) charge, which carries a seven-year consecutive mandatory-minimum penalty. *See* 18 U.S.C. § 924(c)(1)(A)(ii).

As the district court concluded, "[h]ad the Defense decided to offer an affirmative theory of the case, and offered potentially prejudicial evidence like the pornographic searches, and blind pled to the narcotics charge, there is a very real chance Browne could have ended up with a

far worse outcome" (JA 1203). Because there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, Browne cannot show prejudice.

## CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the District Court should be affirmed.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
Assistant United States Attorneys

_____/s/_____
KEVIN BIRNEY
D.C. Bar # 1029424
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Kevin.Birney@usdoj.gov
(202) 252-6829

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 11,593 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
_____
KEVIN BIRNEY
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Max Maccoby, Esq., maccoby@washglobal-law.com, on this 24th day of April, 2023.

/s/
_____
KEVIN BIRNEY
Assistant United States Attorney
